# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 21-0576V

|  |  |
|---|---|
| PATRICIA CORBOSIERO, | Chief Special Master Corcoran |
| Petitioner, | Filed: December 16, 2024 |
| v. |  |
| SECRETARY OF HEALTH AND HUMAN SERVICES, |  |
| Respondent. |  |

*Howard Scott Gold, Gold Law Firm, LLC, Wellesley Hills, MA, for Petitioner.*

*Felicia Langel, U.S. Department of Justice, Washington, DC, for Respondent.*

## DECISION DISMISSING PETITION[1]

On January 12, 2021, Patricia Corbosiero filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. § 300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that she suffered a shoulder injury related to vaccine administration ("SIRVA"), a Table injury, due to an influenza ("flu") vaccine received on October 25, 2018.[3] Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters.

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

[3] Although I interpret the Petition as asserting only a Table claim, I also address herein whether an off-Table claim could succeed on these facts, and find that it cannot.

For the reasons discussed below, I find that Petitioner has not established by a preponderance of the evidence that she is entitled to compensation. Thus, the case is dismissed.

I.   **Relevant Procedural History**

After the case was activated, Petitioner was directed to file additional evidence demonstrating that the onset of her shoulder pain occurred within 48 hours of vaccination (ECF No. 20). Petitioner did so, while also offering a status report requesting that a fact hearing be held if I were inclined to rule against Petitioner on the issue of onset or severity (ECF Nos. 22, 23).

Respondent thereafter filed his Rule 4(c) Report asserting that compensation should be denied for failure to establish that the onset of Petitioner's pain occurred within the time set forth in the Table, and failure to meet the statutory severity requirement applicable to all Program claims (ECF No. 28). After reviewing Respondent's arguments, I issued an order directing Petitioner to show cause why the case should not be dismissed due to the deficiencies Respondent identified (ECF No. 29). I declined to set a hearing, however, because Petitioner had not established a basis for one. *Id.*

On January 12, 2024, Petitioner filed a supplemental declaration and additional medical records as Exhibits 8 and 9, along with a response to the show cause order (ECF Nos. 30, 31). The matter of whether the Petition should be dismissed is now ripe for resolution.

II.   **Relevant Factual History**

A.  **Medical Records**

On October 25, 2018, Petitioner received a flu vaccine in her left deltoid at HyVee Pharmacy in Columbia, Missouri. Ex. 1 at 1. *Eleven months* later, on September 25, 2019, Petitioner saw Dr. Anne Fitzsimmons to establish care. Ex. 3 at 3. This is the first post-vaccination medical record filed in this case and relevant to the claim.

The September 25th record notes that Petitioner reported "left arm pain after flue (sic) shot in 2018, in deltoid area, says decreased ROM [range of motion] of shoulder, quick movement worsened." Ex. 3 at 3. On examination, Petitioner's left shoulder displayed decreased active ROM in abduction and internal rotation. *Id.* at 5. Her external rotation was "ok" and she had good strength. *Id.* She had tenderness in her left deltoid and her supraspinatus was "a little weak." *Id.* While Petitioner linked her left shoulder pain to her vaccination, Dr. Fitzsimmons did not think it was related "except for pain from shot

leading to decreased movement and resulting [left rotator] cuff tendinopathy." *Id*. Petitioner was referred for physical therapy. *Id*.

Two weeks later, on October 10, 2019, Petitioner underwent an occupational therapy ("OT") evaluation for left shoulder pain. Ex. 3 at 7. The record noted a "history of left shoulder pain along her lateral upper arm (deltoid region) since receiving her annual flu shot in October 2018." *Id*. at 8. At the time of the evaluation, her pain level was five out of ten, and ranged from three (at best) to ten (at worst). *Id*. The date of injury was listed variously as October 1, 2018 and "10/__/2018." *Id*. at 7, 8. Petitioner continued OT through November 6, 2019. *Id*. at 20-77.

On November 13, 2019, Petitioner had a left shoulder MRI. Ex. 3 at 90. The MRI revealed mild supraspinatus and subscapularis tendinosis, as well as mild glenohumeral osteoarthritis. *Id*. at 90-91.

There was another two month gap in care, after which Petitioner was seen by orthopedist Dr. Matthew Smith on January 13, 2020. Ex. 3 at 92. Petitioner complained of left upper arm pain since receiving her annual flu shot in 2018. *Id*. She reported experiencing pain with "quick movements" of the upper arm. *Id*. Shortly after the flu vaccine, she stopped using her upper arm. *Id*. OT had helped with her ROM. *Id*. Dr. Smith assessed her with "suspected left-sided intraneural flu vaccine and subsequent post vaccine transient synovitis of the left shoulder," and referred her to physical therapy. *Id*. at 92-93. On January 22, 2020, Petitioner returned to OT. *Id.* at 94. She continued OT until March 12, 2020. *Id*. at 113-195.

Three years later. on August 19, 2023, Petitioner was seen in the emergency department of Boone Hospital Center complaining of a headache, arm pain, and chest pain. Ex. 9 at 1. She stated that the night before she had "severe left arm pain and left shoulder blade pain," and that "she gets chest pain from time to time." *Id*. She denied having an arm injury or previous cardiac history. *Id*. She had been scheduled to have a stress test three years earlier, but never followed up for it. *Id*. Petitioner was admitted due to concern that she had a cardiac event the night before and was now in cardiogenic shock. *Id*. at 4-5. She was assessed with acute coronary syndrome. *Id*. at 13.

### B. Declarations

Petitioner filed four declarations in support of her claim.[4] Exs. 2, 5, 6, 8. In a declaration signed well over a year (and possibly over two years) after vaccination,[5] she states that she began to experience pain "[i]mmediately after" receiving her vaccination. Ex. 2 at ¶ 4. The vaccination situs was very tender and caused significant pain with

---

[4] Although Petitioner labeled these submissions as affidavits, they are not notarized. Nonetheless, they are acceptable as declarations because they comply with the requirements of 28 U.S.C. § 1746.

[5] Exhibit 2 is dated March 24, 202*0*, but was filed on March 28, 202*1*.

movement. *Id.* at ¶¶ 6-7. Concerning the treatment delay, she states "I delayed seeking medical care because I was confident that the pain and stiffness would resolve. When it did not resolve I sought out medical assistance." *Id.* at ¶ 10.

When she did seek care in September 2019, Petitioner told her treaters that her pain was from the October 25, 2018 vaccination. Ex. 8 at ¶ 3. She states that she is able to "distinguish between life-threatening illnesses that require immediate attention, and those that while painful and chronic, we deal with until we cannot." *Id.* at ¶ 4. She cites her August 2023 cardiac event, stating that she initially attributed that pain to her vaccine injury but as it continued, she "became alarmed as I instinctively knew that this was an acute illness." *Id.* at ¶¶ 5, 6. Thus, the next morning she went to the emergency department. *Id.* at ¶ 7. She adds that at the time of her vaccine injury, she did not have a primary care physician, and did not have one until her first appointment with Dr. Fitzsimmons. *Id.* at ¶ 11.

Petitioner's boyfriend, Steven Wieland, states in a declaration signed in November 2022 – *over four years after vaccination* – that shortly after Petitioner's vaccination, she told him that her left shoulder was painful from the vaccination, describing the pain as "unbearable." Ex. 5 at ¶¶ 4, 5. She had "a large red area with a large bump at site of her vaccination. It was quite noticeable." *Id.* at ¶ 6. He "helped her get dressed during the weeks and months following her vaccine injury because she could not use her left arm without severe pain and was limited because of the arm stiffness." *Id.* at ¶ 7. He saw "how much pain she was in and how limited the use of her arm and shoulder was during this time." *Id.* at ¶ 8. Petitioner "would tell me from the time she received her vaccination until the time she received medical attention how much pain she was in," and it was difficult to see her in pain. *Id.* at ¶¶ 8, 9. Petitioner waited to see a doctor "because she fully expected the pain and stiffness to improve," but it did not. *Id.* at ¶¶ 10, 11.

Petitioner's friend, Tina Ray, signed a declaration in support of the claim in November 2022, *four years after vaccination*. Ex. 6. Ms. Ray recalls Petitioner complaining about left shoulder pain from vaccination "[s]hortly after receiving the vaccination in October 2018," describing the pain as "unbearable." *Id.* at ¶¶ 4, 5. Like Mr. Wieland, Ms. Ray describes "a large red area with a large bump at the site of her vaccination." *Id.* at ¶ 6. Also like Mr. Wieland, Ms. Ray says that she "helped [Petitioner] get dressed during the weeks and months following her vaccine injury because she could not use her left arm without severe pain." *Id.* at ¶ 7. Ms. Ray states that Petitioner "expected the arm and shoulder pain to get better . . . but it never did." *Id.* at ¶ 8. Ms. Ray adds that Petitioner "was in pain, every day, between the time she received the vaccine and the day when she finally decided she had had enough and waited long enough and sought medical care" – although she does not explain how she knows that Petitioner was in pain every day during this time period. *Id.* at ¶ 9.

4

### III.    Legal Standards

Before compensation can be awarded under the Vaccine Act, a petitioner must demonstrate, by a preponderance of evidence, all matters required under Section 11(c)(1), including the factual circumstances surrounding his or her claim. Section 13(a)(1)(A). In making this determination, the special master or court should consider the record as a whole. Section 13(a)(1). Petitioner's allegations must be supported by medical records or by medical opinion. *Id.*

To resolve factual issues, the special master must weigh the evidence presented, which may include contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Human Servs.,* 3 F.3d 415, 417 (Fed. Cir. 1993) (explaining that a special master must decide what weight to give evidence including oral testimony and contemporaneous medical records). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

To overcome the presumptive accuracy of medical records, a petitioner may present testimony which is "consistent, clear, cogent, and compelling." *Sanchez v. Sec'y of Health & Human Servs.,* No. 11–685V, 2013 WL 1880825, at *3 (Fed. Cl. Spec. Mstr. Apr. 10, 2013) (citing *Blutstein v. Sec'y of Health & Human Servs.,* No. 90–2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)). The Federal Circuit has "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Human Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021) (explaining that a patient may not report every ailment, or a physician may enter information incorrectly or not record everything he or she observes).

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of a flu vaccine. 42 C.F. R. § 100.3(a)(XIV)(B). The criteria establishing a SIRVA under the accompanying Qualifications and Aids to Interpretation ("QAI") are as follows:

> Shoulder injury related to vaccine administration (SIRVA). SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the

5

underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis (even if the condition causing the neurological abnormality is not known). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:

(i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;

(ii) Pain occurs within the specified time-frame;

(iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

(iv) No other condition or abnormality is present that would explain the patient's symptoms (*e.g.* NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id.*

## IV.    Parties' Arguments

Respondent asserts that Petitioner is not entitled to compensation for two reasons. Respondent's Rule 4(c) Report, filed June 28, 2023 (ECF No. 28) ("Respondent's Report"). First, Petitioner has not established that the onset of her pain began within 48 hours of vaccination. Respondent's Report at *5. Respondent emphasizes that Petitioner did not report left arm pain and reduced ROM until *eleven months* after vaccination. *Id.* Although Petitioner states in her declaration that she delayed seeking medical care because she thought her symptoms would resolve, Respondent argues that it is "unreasonable to expect that, had petitioner experienced persistent left shoulder pain that

began within 48 hours of her vaccination, she would have waited almost a year to seek medical care." *Id.*

Second, Respondent argues that Petitioner has not shown that she suffered the residual effects or complications of her alleged vaccine injury for more than six months. Respondent's Report at *5. Petitioner has not provided any *contemporaneous* evidence showing that she had left shoulder pain at any time during the six months following vaccination. *Id.* Respondent argues this is similar to *Adkins v. Sec'y of Health & Human Servs.*, No. 20-813V, 2022 WL 1134998 (Fed. Cl. Spec. Mstr. Mar. 24, 2022) (dismissing case for failure to satisfy severity requirement where, after initially seeking care for shoulder pain, the petitioner did not thereafter seek care again for 17 months).

Petitioner responds to the above by contending that she delayed seeking care because her shoulder pain was not an emergency, and that she believed it would resolve on its own. Petitioner's Response to Show Cause Order, filed Jan. 12, 2024, at *1 (ECF No. 31) ("Pet."). In addition, prior to her vaccine injury, she did not have a primary care physician – meaning that she did not have an existing provider to turn to, and after months of pain had to find a new doctor. Pet. at *2.

Petitioner also asserts that she has a habit of putting off seeking medical care, exemplified by her August 2023 cardiac event. Pet. at *1-2. She emphasizes that the records indicate that she had been suffering from intermittent chest pain for months beforehand, but did not seek care because she thought the pain would subside. *Id.* at *2. Petitioner adds that she delayed seeking care for her vaccine injury because she "understood that there is a difference between chronic pain and life-threatening pain." *Id.* at *2.

Moreover, Petitioner maintains that the record does link her delayed complaints of pain to the earlier vaccination. Dr. Fitzsimmons, for example, stated that she did not think Petitioner's injury was related to her vaccination *except* to the extent the pain led her to move her arm less, resulting in tendinopathy – meaning that Dr. Fitzsimmons *did* relate Petitioner's injury to vaccination to some degree. Pet. at *3. And Dr. Smith diagnosed Petitioner with "suspected left-sided intraneural flu vaccine and subsequent post vaccine transient synovitis of the left shoulder." *Id.* (citing Ex. 3 at 92). Petitioner asserts that her treating physicians' records support an immediate onset of her injury, and while treating physician opinions are not binding, they are persuasive. *Id.* at *3-4. Petitioner adds that she should not be "penalized" for initially treating her injury conservatively. *Id.* at *4.

In order to clear up this dispute, Petitioner requests that I schedule a short evidentiary hearing to hear from Petitioner so that I may make a determination on her credibility. Pet. at *4. She acknowledges the importance of judicial economy, but argues that "justice overrides that interest in this specific case." *Id.* at *5. She argues that her testimony is consistent, and her medical records "refer back to the date of vaccination."

7

*Id.* Her August 2023 medical incident "affirm[s] her hesitancy to seek out care except in long standing or life-threatening situations." *Id.* Her treating physicians diagnosed her with a "flu vaccine injury," and her October 2018 vaccination is the only flu vaccine she is known to have received during the time in question. *Id.* And there is no alternate cause, or reason to suspect any other cause, of her shoulder injury. *Id.* Petitioner asserts that "it is arbitrary to suggest that eleven (11) months is a length of time whereby vaccine causation becomes unlikely, particularly given that the medical records wholly and completely support the allegations." *Id.* She concludes that she is an "honest, 'tough-it-out' woman" who suffered a vaccine injury and is entitled to compensation. *Id.*

## Analysis

After a careful review of the entire record, I determine that Petitioner has not preponderantly established that the onset of her shoulder pain occurred within 48 hours of vaccination - or within *any* timeframe from which vaccine causation could plausibly be found. Petitioner therefore cannot prevail on a Table or off Table claim.

A significant delay in treatment can greatly undermine a finding that Table onset is met. *See Orban v. Sec'y of Health & Human Servs*., No. 21-0978V, 2024 WL 3205134 (Fed. Cl. Spec. Mstr. May 28, 2024) (ruling that the petitioner had not shown that the onset of her shoulder pain occurred within 48 hours of vaccination where she did not seek care until nearly seven months thereafter and, in the interim, underwent a comprehensive physical examination not recording any abnormalities in her joints or muscles); *McCarthy v. Sec'y of Health & Human Servs*., No. 21-0425V, 2023 WL 9063478 (Fed. Cl. Spec. Mstr. Nov. 29, 2023) (finding onset of shoulder pain was not within 48 hours of vaccination where the petitioner did not seek care until nearly eight months later); *Shoemaker v. Sec'y of Health & Human Servs*., No. 20-0625V, 2022 WL 2288698 (Fed. Cl. Spec. Mstr. Jan. 18, 2022) (finding that a petitioner had not shown that the onset of her pain occurred within 48 hours of vaccination where she did not seek care until ten months afterward, and finding that the claimant's lack of a primary care physician was not sufficient to overcome this significant treatment delay), mot. for. review den., 160 Fed. Cl. 307 (2022).

This case is similar to *Shoemaker* in that the petitioner attributed the lengthy treatment delay to the lack of a primary care physician, but Ms. Corbosiero delayed seeking care for even *longer* – eleven months compared to ten. And at her first visit, she complained of arm pain "after" vaccination, with no indication of *how long* after. Given that it had been nearly a year since her vaccination, this lack of specificity leaves far more room for the onset of her pain to be *outside* of the 48-hour window than within it.

The testimonial evidence does not fill in the significant treatment gap. It is also not contemporaneous, in addition to being conclusory, lacking in supporting details, and devoid of explanation as to how the declarants were able to recall the information so long after the events in question. Such testimonial evidence is not convincing in the context of a complete lack of contemporaneous documentary evidence.

The records pertaining to Petitioner's August 2023 cardiac event (stating that she had not followed up on a stress test *three years* earlier) *do* support Petitioner's contention that her practice may have been to put off medical care. But that only goes so far, and does not adequately support an affirmative finding that her pain occurred within 48 hours after she delayed seeking care for nearly a full *year*. More critically, this significant delay means that there is a dearth of evidence as to the specific 48-hour period following vaccination. That Petitioner's two supporting witness statements, from her boyfriend and friend, are similarly non-specific and nearly identical to one another, further weakens her claim. And not having a primary care physician indeed can result in delays in receiving care – but Petitioner has not shown that it delayed her ability to seek care for nearly *a year*.

Although I have frequently noted in other decisions that it is not uncommon for SIRVA petitioners to delay seeking care in hopes that their condition will resolve on its own,[6] this does not mean that a petitioner can prevail *no matter the length* between vaccination and their first medical treatment. As the treatment delay becomes longer, the evidence becomes less contemporaneous, weakening a claim. Petitioner's suggestion that ruling against her would mean that I am arbitrarily setting a treatment delay of 11 months as a barrier to a finding of vaccine causation is incorrect. I of course review the facts of a particular case to determine what the evidence preponderantly supports, and it is conceivable a facially-lengthy post-vaccination timeframe could still be deemed acceptable. But that requires corroborative evidence of a greater sum than has been offered herein.

Furthermore, there is insufficient evidence to demonstrate that Petitioner suffered the residual effects of her injury for more than six months – also known colloquially as the "severity requirement." In order to meet this requirement (which applies to Table and non-Table claims alike), Petitioner would need to demonstrate that her symptoms continued through the end of April 2019. But there is no evidence that Petitioner was experiencing residual effects in this timeframe. There are no medical records because Petitioner did not seek care until months later. And the testimonial evidence does not address this specific timeframe. As such, Petitioner has not demonstrated by preponderant evidence

---

[6] *Tully v. Sec'y of Health & Human Servs.*, No. 21-1998V, 2024 WL 4533515 (Fed. Cl. Spec. Mstr. Sept. 20, 2024); *Amor v. Sec'y of Health & Human Servs.*, 20-0978, 2024 WL 1071877, at *6 (Fed. Cl. Spec. Mstr. Feb. 8, 2024); *Winkle v. Sec'y of Health & Human Servs.*, No. 20-0485V, 2021 WL 2808993, at *4 (Fed. Cl. Spec. Mstr. June 3, 2021).

9

that she has satisfied the severity requirement, a mandatory requirement of the Vaccine Act. *See Adkins*, 2022 WL 1134998, at *3 (dismissing petition for failure to meet the statutory severity requirement where the petitioner sought care soon after vaccination, but not again until 17 months later, noting that the record was "almost silent" on Petitioner's condition during the relevant six month period after onset). Petitioner's failure to satisfy the severity requirement means that she cannot prevail on *any* claim, Table or off-Table.

Resolution of these fact issues did not warrant an evidentiary hearing. "[A] special master has discretion whether or not to conduct an evidentiary hearing before deciding a case." *Hooker v. Sec'y of Health & Human Servs.*, No. 02-472V, 2016 WL 3456435, at *21 (Fed. Cl. Spec. Mstr. May 19, 2016) (noting that section 12(d)(2)(D) of the Vaccine Act encourages special masters to decide cases without routine use of oral presentations, cross examination, or hearings, and that the Vaccine Rules allow a special master to decide a case on the record without a hearing); *see also Hovey v. Sec'y of Health & Human Servs.*, 38 Fed. Cl. 397 (1997), appeal dismissed, 135 F.3d 773 (ruling that special master acted within his discretion in denying hearing).

Petitioner's request for a hearing is premised on an assumption that my view of the evidence depends on my findings as to Petitioner's credibility – which is not correct. Even if I were to find Petitioner to be fully credible, the evidence she has offered would be insufficient for me to find that she has preponderantly established entitlement to compensation. (And in any event, efforts to explain away such a dearth of contemporaneous proof are themselves reason to doubt credibility to some extent). Thus, while I am required to provide Petitioner with a full and fair opportunity to present her case,[7] I have done so.

## Conclusion

**Petitioner has failed to preponderantly establish that the statutory severity requirement is satisfied, or that her injury meets the requirements for a Table SIRVA or a shoulder injury caused in fact by the flu vaccine. Accordingly, this case is DISMISSED for insufficient evidence. The Clerk of Court shall enter judgment accordingly.[8]**

---

[7] *Hovey*, 38 Fed. Cl. at 400-401.

[8] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master